O'Neale v. Cleaveland.

3   485
26  321

WILLIAM T. O'NEALE, Respondent, v. A. C. CLEAVE-LAND, Appellant.

"Occupant" and "party in possession" as used by the Legislature in the Act in regard to the "Selection and Sale of Lands, etc.," are not strictly synonymous. Occupant means one dwelling upon and occupying a part of a tract of land; it does not necessarily imply that the party is in possession of the whole.

Section 11 in this Act if construed by itself would be held to confer a preferred privilege on the occupant to purchase the entire sixteenth or thirty-sixth section upon which he might have an occupancy; but taken in connection with other sections it is clear that the Legislature only intended to give this preferred right to the extent of either one hundred and sixty or three hundred and twenty acres.

Lands selected in lieu of sixteenth and thirty-sixth sections are to be disposed of in accordance with the provisions of Sections 12 and 21 of this Act.

The twelfth section was intended by the Legislature to give a preferred right to the actual occupant. But the extent of that preferred right not being shown in Section 12, we have to resort to Section 11 and other portions of the Act to ascertain the extent or quantity of land to be affected by this preferred right. That quantity cannot be less than one hundred and sixty acres.

Section 12 gave first a preferred right to the actual occupant; next, if no claim was asserted by an actual occupant, then to any person who had applied to locate a land warrant, on land selected in lieu of the sixteenth and thirty-sixth sections. This view of the twelfth section is confirmed by an examination of the provisions of the twenty-first section.

Section 21 taken in connection with other portions of the Act indicates: First, that an occupant shall have a preferred right of purchase over all other persons; second, that right shall be limited in quantity to one hundred and sixty or three hundred and twenty acres; third, actual occupancy of any portion of the section would give a preferred right to at least one hundred and sixty if not to three hundred and twenty acres; fourth, the purchase should be within the time limited to other preferred purchasers.

Persons who became occupants (before selection) of land afterwards selected in lieu of sixteenth or thirty-sixth sections, are entitled at their option to buy the same at one dollar twenty-five cents per acre, although they may have previously purchased a land warrant to locate the same lands.

When there is a statement on motion for a new trial, there need be none on appeal.

The seventh section of the land Act which provides for taking testimony before a Commissioner, was not intended to prohibit the Judge hearing such testimony when convenient to himself and preferable to the parties.

Stipulations in regard to taking testimony should be interpreted liberally, to carry out the obvious intention of the parties, and in such way as not to defeat the ends of justice.

THIS was an appeal from the District Court of the Third Judicial District, Washoe County, Hon. C. N. HARRIS, presiding.

The facts are fully stated in the opinion of the Court.

*R. M. Clark,* for Appellant, made the following points :

Land could not be located prior to April 2d, 1867. (Act 1865, p. 174, Secs. 4–5. Act 1866, p. 194, Secs. 3–4.)

Under the Act of 1867, Section 12, the parties have equal rights before the law. *Neither can in this particular be preferred.* (Act 1867, p. 165, Sec. 12.) Act not retrospective. (*Milliken* v. *Sloat,* 1 Nev. 577, 578.)

The land in question was "claimed under State law," and is therefore not liable to be located with scrip, *except by actual occupant or person in possession.* (Sec. 12, Act 1867.)

What did the Legislature mean by use of terms " occupant," " possession," etc. ? (23 Cal. 442 ; 25 Id. 131 to 135 ; 31 Id. 418 ; 10 Peters, 189.)

Cleaveland being in possession has preferred right under Act of 1867. (Secs. 7, 12, 21.)

*Two classes of preferred rights not inconsistent.*

Cleaveland being in possession of a *part* and claiming *title* thereto must be permitted to hold that part, and the judgment must be reversed.

This case is clearly appealable. (Land law 1867, Sec. 7, p. 167 ; Const. State, Art. VI, Sec. 4.)

The term " *under any law of this State*" cannot be restricted to statutory law. (Sec. 12, Act 1867, p. 169.)

Cleaveland having purchased a School Land Warrant is not for that reason deprived of the benefits of Section 21, Act 1867, p. 1.

The land is not subject to preëmption. (Lester's Land Law, p. 62.)

The objection to taking of proof before Judge is not well taken, and if it were could not be taken advantage of by O'Neale.

*George A. Nourse*, for Respondent.

This Court cannot look beyond the judgment roll in this action, for the reason that no grounds of error are assigned or stated by appellant in his statement on appeal. (Laws of Nevada, 1861, p. 362, Sec. 276; *Barrett* v. *Tewksbury*, 15 Cal. 354; *Hutton* v. *Reed*, 25 Id. 478, 485–6, emphatically affirming former case. See also for purpose of comparing statutes, Cal. Practice Act, Sec. 338; *Burnett* v. *Pacheco*, 27 Cal. 411; *Wixon* v. *B. R. & A. Water & Min. Co.*, 24 Cal. 367.)

Nor does the stipulation that " the notice of application for a new trial shall be considered the assignment of errors and grounds on motion for new trial" constitute such a " statement of the grounds on which he intended to rely," as our Statute requires. They are vague, indefinite, and uncertain, and do not direct the Court in any degree to the grounds of error specifically relied upon.

Under Section 7 no testimony could be taken in Court. That section confines the testimony to such as is offered before the Commissioners. The agreement *assuming* the right to take testimony before the Judge conferred no new right. If the right already existed (and we contend it did not) to take testimony before the Court, then it was reserved; but if no such right legally existed, then surely none was created by this agreement.

When O'Neale and Cleaveland made their application to locate with land warrants, there was no law authorizing such location, and neither at the time derived any advantage from the offer. The subsequent act, however, must be held to take effect by relation *nunc pro tunc*, so as to effectuate each offer as of the date when made, and so give effect to the prior offer of O'Neale.

After the passage of the subsequent law, O'Neale showed the greater diligence: he was the first to apply for its benefit. But if

the evidence be held properly admitted by the Judge who tried the case, even then the appellant has no case, for Section 12 of the Land law of this State gives to him who had, previous to the passage of the law, sought to locate a land warrant upon selected lands, a right "*prior*" to any other, except such as existed under some law of the State previously passed.

The appellant fails entirely to show himself previously "an occupant or party in possession," (Sec. 6) or "an actual occupant," (Sec. 11) and to prove that he had "a prior title or claim thereto under any law of this State" (Sec. 12).

Nor has he any claim under Section 21, for the record shows that he had, prior to the passage of the Act, purchased land warrants for the land in question.

The only question for discussion in this case is really that of the occupancy of the premises by plaintiff.

The other questions need no discussion.

The proof upon this point fully sustains the findings to the effect that (see eighth finding) "Cleveland never defined nor attempted to mark by metes or bounds the extent of the tract of land to which he herein asserts a claim." There is not in the case one word of testimony to show that he ever attempted to mark out his claim.

Now the terms "occupancy" and "actual possession" used in the law had a well-settled legal meaning when this statute was passed. In the case of agricultural land, no person was deemed to be in possession, so as to sustain an action or maintain a defense in ejectment based upon possession, unless he fenced in his claim with all convenient dispatch, there being no survey made by the County Surveyor.

This is *timber* land—so found by the Court, and so testified to by all the witnesses—"valuable only for the pine wood and timber thereon growing."

The Courts have never required that timber land should be *inclosed*, for "the law does not require a vain thing."

As a dwelling and inclosure of the land claimed is necessary to show occupation or possession of land claimed as a ranch, so a distinct marking out of the boundaries of the land claimed has always been deemed necessary to constitute possession of timber land. (*McFarland* v. *Culbertson*, 2 Nev. 282.)

O'Neale *v.* Cleaveland.

In all cases a *pedis posssessio* must be shown. (*Sankey* v. *Noyes*, 1 Nev. 72.)

The reason of the rule is very distinctly recognized, as applied to mining claims, in *English* v. *Johnson*, 17 Cal. 116–7–8. Now an " *actual occupant* " must have performed acts of possession still more efficient and notorious than are needed to constitute mere legal possession. (*Minturn* v. *Burr*, 16 Cal. 109.)

On general subject of possession of lands, and what constitutes it, see *Plume* v. *Seward*, 4 Cal. 94 ; *Murphy* v. *Wallingford*, 6 Id. 648 ; *Wilson* v. *Corbier*, 13 Id. 167 ; *Preston* v. *Kehoe*, 15 Id. 318 ; *Havins* v. *Dale*, 18 Id. 368.

To show any one in possession of any land, it has (as the foregoing cases show) always been held in this State and California, that he must be proved to exercise actual dominion over the premises for the purposes for which it is valuable.

*Ellis & Sawyer*, on the same side.

Section 6 of the Act is in regard to a different class of lands from this in controversy. The only sections of the Act applying to this class of lands are Sections 12 and 21.

If Cleaveland was in possession of the land in controversy, and had not purchased a land warrant therefor, he was entitled to buy at a price to be fixed by the Board of Regents. He was not entitled to pay for the land with a land warrant. Nor under this section has he any preferred right. It is a simple right to buy in a certain way, and if another makes a prior proposal to purchase under some other provision of the Act, the latter would have the advantage of the first offer.

Cleaveland can only rely on Section 12 for a preferred right, and under that Section O'Neale has a preferred right antedating his right.

Opinion by BEATTY, C. J., LEWIS, J., and JOHNSON, J., concurring specially.

This is a contest under the provisions of an Act entitled " An Act to provide for the Selection and Sale of Lands granted by the United States to the State of Nevada," approved April 2d, 1867.

The question to be determined is, whether O'Neale or Cleaveland shall have the preferred right to purchase a certain quarter section of land.

The facts appear to be, that in the winter or spring of 1866, Cleaveland built a cabin on the quarter section of land in controversy, repaired an old inclosure containing something like an acre of ground, and cultivated the same as a garden, and occasionally slept in the cabin. Whilst thus occupying, or claiming to occupy, this cabin and garden, he applied to the United States Land Office to preëmpt this quarter section. This application was refused, on the ground that he did not establish the necessary acts to entitle him to a preëmption right. In November or December of the same year, and after his preëmption claim had been rejected, he proceeded to build a better house on the same premises. This house was finished about the seventeenth of December, 1866, and immediately after it was finished Cleaveland moved into it, and has continued to reside there ever since.

On the seventh day of December, 1866, the then Superintendent of Public Instruction for the State of Nevada, applied to have this land selected by the State in lieu of the sixteenth and thirty-sixth sections, which had been lost to the State by reason of preëmption claims thereon.

On the tenth day of December, 1866, O'Neale applied to locate a land warrant on this quarter section. The Surveyor General refused to recognize this application, on the ground that the law, as then existing, did not authorize the location of school-land warrants on land selected in lieu of the sixteenth and thirty-sixth sections, theretofore claimed by and allowed to preëmptors.

Subsequently in March 1867, Cleaveland made a similar application, which was disposed of in the same way.

On the second of April, 1867, our present law was passed in regard to the location of sixteenth and thirty-sixth sections of land, and also of lands selected in lieu of sixteenth and thirty-sixth sections.

On the fourth of April, two days after the passage of the law, O'Neale applied a second time to locate his land warrant on this quarter section. On the twelfth day of April (eight days later)

O'Neale *v.* Cleaveland.

Cleaveland also renewed his application either to locate his land warrant on this quarter or to be allowed to pay for the same.

Under the provisions of the statute the controversy was referred to the District Court of the county where the land was situated. That Court held that O'Neale had the preferred right to purchase, and Cleaveland appeals.

The rights of the parties depend on the construction to be given to the Act of the second of April, 1867. This Act is full of repetitions, and is as ambiguous and confused in its phraseology as an Act could well be. Yet, taking the whole Act together, it appears not very difficult to arrive at the intention of the Legislature.

It must be borne in mind that the Act of 1864–5 authorized the sale of floating land warrants, and the location of these warrants by the purchasers upon any of the subdivisions of Sections 16 or 36, reserving to those who had improvements on, occupation of, or possession of any part of such sections, a preëmption right to the extent of 160 acres.

This law was amended in 1866 so as to confine the preëmption right to those persons who had complied with the possessory laws of the State.

By the law of 1866 provision was also made for the selection of other lands in lieu of such sixteenth and thirty-sixth sections as had been previously claimed by preëmptors. But this law made no provision for the sale of these selected lands nor the location of land warrants on them. It is clear, then, the application both of O'Neale and Cleaveland to locate their warrants on the land in controversy made in December 1866, and March 1867, were perfectly idle ceremonies. Neither derived any rights thereunder.

The Act of April 2d, 1866, provides for the selection of lands granted by the various Acts of Congress to the State of Nevada. Section 6 of that Act directs the sale of the lands thus to be selected to the highest bidder, but provides that an occupant or party in possession shall have a preferred right to purchase one hundred and sixty acres at the minimum price of one dollar and a quarter per acre.

Section 11 is in this language: " The actual occupant who has made improvements on any portion of Sections 16 and 36,

prior to the passage of this Act, shall have the preferred right for six months after the passage of this Act to purchase the same, after which time the same shall (if not previously entered or purchased by such actual settler) be subject to entry by any person desiring the same ; *provided*, that parties settled and residing upon either a sixteenth or thirty-sixth section, before survey, shall have six months after such survey is made in which to purchase."

We will examine some of the phrases in the sixth and eleventh sections before going further. The first question is, did the Legislature, in using the phrase occupant or party in possession, use occupant and the latter part of the phrase as strictly synonymous terms, or does occupant mean something different from a party in possession. We think the phrases are not strictly synonymous.

There is a law of the United States allowing occupants who possess certain qualifications, and who have made a certain character of improvements, to preëmpt a quarter section of United States land. Occupant, as used in that law, means a person who is living upon the quarter to be preëmpted, but does not necessarily mean one who is in possession of the entire quarter. Under that law the person living upon a quarter section and possessing the other necessary qualifications of a preëmptor, and having made the necessary improvements, is entitled to preëmpt the entire quarter, although he may not be in actual possession of one-tenth part thereof.

There are cases in which the preëmptor, to include his improvements, is allowed to go off of the quarter on which he lives and take other forty-acre tracts to make up his quantity. But these are exceptional cases. The general rule is that the occupant (that is, the dweller upon) is entitled to preëmpt the quarter upon which he resides. We think then that the Legislature, in using the word " occupant " in the sixth section of the Act, used it in the popular sense, and indicated the intention to allow those who dwelt upon a a quarter section of land to preëmpt the same, whether in possession of the whole or only a part thereof. This section refers to a different class of lands from that in dispute, and we have only referred to this section to try and ascertain the general intent of the Legislature and the scope of the law.

If we were called on to interpret the eleventh section standing alone, we would say that it gave the right to the occupant (that is to a person actually living upon a sixteenth or thirty-sixth section) to preëmpt the entire section upon which he was living. "To purchase the same," as it stands in this section, according to the ordinary rules of language, may refer to either one of three things: first, "his improvements;" second, "any portion of sections sixteen and thirty-six on which his improvements are located;" or third, "the entire section on which he has made improvements." It will hardly be contended that the Legislature intended to limit the occupant to the purchase of his own improvements, to wit: houses, mills, etc., without the right to purchase any part of the land. Before the title passed from the Government, the occupant could remove his improvements without buying. The right to buy any portion of the land on which his improvements are situated, would if literally carried out, only entitle a party who had built a valuable house or mill to buy so much of the soil as was covered by his structure. This would certainly be but a poor privilege. A house or mill with only the soil on which it stands, would be next to worthless. To give, however, to a party the right to purchase six hundred and forty acres of land where he had built a mill or house on any portion of that six hundred and forty acres, would not in this country, where land is so abundant and so little of it occupied, appear to be unreasonable. Grammatically the word "same" may as well in this sentence refer to the whole section of land as to the improvements, or as to the particular part of the land covered by improvements. And such we should clearly hold to have been the meaning of the Legislature but for other sections of the Act. Section 6 clearly limits the right of preëmption at minimum price, in lands selected under that section, to one hundred and sixty acres. Section 7 limits the right of purchase by one person, under this Act, to three hundred and twenty acres. In other words, no person, whether a preferred or ordinary purchaser, can buy more than three hundred and twenty acres, and a preferred purchaser (at least so far as the lands selected after the passage of this Act are concerned) can buy no more than one hundred and sixty at the minimum price.

Taking Section 11 then in connection with the other sections, and considering the general objects of the Act, we are satisfied that the Legislature by that section did not intend to limit the preferred right of occupants either to the purchase of their own improvements or of the very land on which such improvements were erected. Nor, on the other hand, did the Legislature intend to give the preferred right of purchase to the entire section. But that right was intended to extend either to the purchase of a quarter section or a half section, including the improvements.   To determine whether a party having made improvements on a sixteenth or thirty-sixth section is entitled to a preferred right to purchase a quarter or a half section, is a question of much difficulty, and in this case need not be determined, as only a quarter section is claimed.

Sections 12 and 21 of the Act of 1867 are in the following words :

" Sec. 12. Lands selected prior to the passage of this Act, in lieu of the sixteenth and thirty-sixth sections, shall be sold as the sixteenth and thirty-sixth sections ; *provided,* that where any person shall have applied to locate school land warrants upon such lands, such person shall have a prior right for thirty days after the passage of the [this] Act, to locate such warrants upon the land he may have applied to make such location upon, in case there be no prior title or claim thereto, under any law of this State.

" Sec. 21. Any person or persons in possession of lands heretofore selected by the State in lieu of the sixteenth and thirty-sixth sections, for which school land warrants have not been purchased by him or them, shall have the privilege of purchasing said lands at such rate per acre as the Board of Regents may determine ; *provided,* in cases where persons were in possession of any such lands prior to the time of selection thereof by the State, and waive the right of preëmption in favor of the State, such person may purchase at the rate of one dollar and a quarter per acre."

The land in controversy here was selected in lieu of the sixteenth and thirty-sixth sections before the passage of this law.   The mode of this disposal is provided in the twelfth and twenty-first sections. It is to be sold in the same manner as the sixteenth and thirty-sixth sections ; consequently the interpretation which we have put upon the

eleventh section—which is in reference to the sixteenth and thirty-sixth sections—must determine Cleaveland's rights as to this land, unless there is something in the proviso of section twelve which makes an occupant's rights on this land less available than they would be on a sixteenth or thirty-sixth section.

The expression " in case there be no prior title or claim thereto under any law of the State," at the close of Section 12, is rather ambiguous. A person settled on any part of a quarter or half section of public land certainly has some claim to that land on which his house is situated, if no more ; and we are clearly of the opinion that the Legislature intended to protect that occupancy, and give the occupant a preferred right of purchase to some extent. Whilst Section 12 is entirely silent as to what shall be the extent of that preferred right, and Section 11—with which it stands connected—is not very definite ; still, taking the whole Act together, we are satisfied not less than one hundred and sixty acres was intended to be thus protected.

This Section 12 seems to have been formed with the view : First, of giving a preferred right to the actual occupant when there was such person, and he chose to assert his right ; second, if there was no occupant, or he waived his right, then to give a preferred right (over third parties) to one who before the passage of this Act had applied to locate a land warrant on lands selected in lieu of a sixteenth or thirty-sixth section.

The provisions of Section 21 are confirmatory of the views we have taken of Section 12. This section in its first clause allows persons who were at the passage of the Act in possession of land theretofore selected in lieu of the sixteenth and thirty-sixth sections, and who had not purchased school land warrants, to buy the same at a price to be fixed by the Regents. It will be observed that this clause is as loose as most of the other sections. There is no express declaration that such persons shall have a preferred right to purchase, nor is there any limitation expressed as to the quantity they may purchase, or the time within which they may purchase.

But taking this in connection with other parts of the Act, and it would seem : First, that this right of purchase was to be a preferred one over all other classes of purchasers ; second, that the preferred

right should be limited in quantity either to a quarter or half section; third, that actual occupancy of any portion of a quarter section would give the preëmption right to at least the whole quarter, if not to two quarters; fourth, the purchase should be within the time limited in other cases of preferred purchases.

The proviso in the second clause of section twenty-one must be interpreted in consonance with the interpretation put on the first clause of that section, so far as it concerns the preferred privilege of purchase of the quantity purchaseable and the kind of possession required. We think in cases coming under the proviso in section twenty-one, parties would have the right to purchase at one dollar and a quarter per acre, whether they had or had not purchased land warrants to locate this particular piece of land. When they entered on such lands as are mentioned in section twenty-one, after selection by the State, and bought land warrants (which sold at five dollars an acre) to locate on the land occupied, it might well be said by the State that the lands were voluntarily taken at that price, and the occupant would not be allowed to recede. So if the warrants were not actually bought, the Board of Regents might fix a price. But it seems to have been the clear intent to allow all settlers who went on the land, before it was selected by the State, to buy at one dollar and a quarter per acre. We do not think if a settler, before selection, was driven by his anxiety to secure a title to the purchase of a land warrant at five dollars per acre, he would be forced to use it in the purchase of land coming under this proviso; but he might at his option pay for it in money at one dollar and a quarter per acre.

Giving then to this Act such interpretation as we think best calculated to carry out the intention of the Legislature, and effect the the objects for which it was passed, we think every settler on a quarter section of public land, which after such settlement was selected by the State, should be protected in a preferred right to purchase the quarter on which he was located at the time of such selection.

With these views of the law we come to the conclusion that Cleaveland had a preferred right to purchase the land in controversy, and might pay for the same either with his land warrant, or with money at one dollar and a quarter per acre.

Before finally disposing of this case, it is perhaps best to notice some points of practice on which questions were raised in this Court.

Respondent objects to looking beyond the judgment roll in this case, because the statement on appeal does not show or state the grounds of error relied on. There is a statement on motion for new trial in the transcript, and that statement does contain the grounds relied on. There is no statement on appeal, and need be none. The statement on motion for new trial is sufficient. (See *Hooper* v. *Meyer*, 1 Nev. 433.)

Section seven of the Act of 1867 provides in a case of this kind for taking testimony before a Commissioner residing in the neighborhood of the land in dispute. Indeed, it says such Commissioner shall take and report all the testimony of the parties. But we think the common sense construction of this clause is, that the Commissioner shall take all the legal testimony offered before him. We do not think it was intended to prevent the Court or Judge from hearing testimony in cases where he could conveniently do so, and the parties preferred this course.

Here there was a stipulation agreeing upon certain facts in the case, and reserving the right to each party to prove additional facts, if deemed necessary, by witnesses introduced in Court on the trial. Respondent contends that the right in such case to take testimony never existed, and therefore the reservation of that which did not exist amounts to nothing. This is entirely too technical.

To give a liberal and fair construction to this instrument, we should certainly hold that it amounted to written assent on both sides that oral testimony might be introduced on the trial. Such stipulations should always receive a fair and liberal construction, so as to carry out the apparent intentions of the parties and promote fair trials on the merits, rather than a narrow, contracted, technical interpretation, calculated to take parties by surprise and defeat the ends of justice.

There can be no doubt in this case but that this stipulation was entered into for the express purpose of letting in oral testimony before the Court at trial. We will not so interpret it as to defeat its obvious purpose.

But even if this testimony was rejected the result would be the same. The findings of fact show the judgment should have been for Cleaveland. Even if we were to reject all the oral evidence we could not substitute new findings for those of the Court, consequently we would have to send the case back for a new trial, and then the facts which exist in the case could be properly proved.

The judgment of the Court below is reversed and a new trial is ordered.